IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Walker D. Miller

Civil Action No. 04-cv-2149-WDM

NICK W. VALDEZ,

Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner of Social Security,

Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Miller, J.

A draft of the following order was submitted by defendant's counsel without objection by plaintiff. With minor changes, I adopt the order as accurately representing my findings and conclusions in the format I commonly use.

Plaintiff Nick W. Valdez (Valdez) seeks judicial review of the Commissioner's decision made by Administrative Law Judge (ALJ) Henry M. Paro, finding that his entitlement to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433, ceased as of April 1, 2002. Following review of the record and the parties' written and oral arguments, I affirm the Commissioner's findings that Valdez's disability ceased as of April 1, 2002.

### Background

Valdez alleged he continued to be disabled and unable to work on and after

April 1, 2002, due to residual effects of low back pain.  Born April 25, 1962, he was 39

years old on April 1, 2002, the date the Commissioner found his disability ceased.

Valdez earned the equivalent of a high school diploma, and provided information

reflecting that he had worked in the past as a temporary laborer.

Valdez testified regarding his alleged continuing disability at the February 2004

administrative hearing.  He said he had not lifted anything in a long time, he had

difficulty getting out of bed in the morning, and he did not drive at all due to pain while

sitting.  Valdez said he washed dishes, made meals occasionally, and dusted.  He

reported that his sister and girlfriend did the household chores, vacuumed, washed

his laundry, and shopped for groceries; and his father did all yard work.  Valdez stated

that he generally arose at about 7:00 a.m., stretched his legs, did a little exercise,

shaved, showered, walked around, occasionally made meals, watched television,

visited his father, took car rides with his father, and napped for a few hours.  Valdez

testified he took Vicodin and Soma for pain, which made him sleepy.  He said that he

slipped in February 2001, but it caused no real problems with his back, just a little

soreness.

The medical record reflected that Valdez underwent lumbar surgery with

instrumented fusion in March 1993.  He obtained solid fusion and "great

improvement" of leg pain.  Due to continued back achiness and stiffness, he

underwent removal of the hardware in April 1994.  One year later, in April 1995,

Kenneth Danylchuk, M.D., Valdez's orthopedic surgeon, reported that Valdez walked

"extremely smooth" and had a "perfect gait," intact bladder and bowel function, "excellent strength," negative straight-leg-raising, and "good flexibility." Dr. Danylchuk indicated that Valdez was close to maximum medical improvement and no further treatment was indicated.

On December 27, 1997, John Sacha, M.D., examined Valdez. Valdez reported he took only Tylenol for pain. Dr. Sacha noted that Valdez moved about the examining room without difficulty, sat comfortably, doffed and donned his clothing without difficulty, and had "good concentration." Valdez had normal coordination, station, gait, and muscle strength. Dr. Sacha noted that Valdez had flattened lumbar lordosis, decreased lumbar flexion, diffuse point tenderness over the lumbar spine, positive straight-leg-rasing, decreased muscle bulk in the left calf, decreased sensation in a right L3 distribution, and absent left ankle reflexes. Dr. Sacha opined that Valdez could lift and carry 25 pounds frequently and 50 pounds occasionally; stand and or walk for 2 hours without restrictions; sit continuously without restrictions; and stoop up to 10 times per hour.

In December 1999, Valdez sought treatment for the flu. In January 2000, he sought treatment for sinusitis.

Valdez presented to Family Medicine Clinic on February 2, 2001, reporting low back pain after he slipped on ice. Valdez said he took no medications. He had a normal gait, negative straight-leg-raising, and good strength, but was a little stiff. On February 14, 2001, he returned for follow-up of low back pain. He reported that Soma

3

and Relafen provided "significant relief" of pain.

On March 22, 2001, Valdez presented to Family Medicine Clinic for follow-up of acute back pain. Valdez reported that Soma provided "significant relief." He requested a "permanently disabled statement so that he [could] get a fishing license." Jennifer Still, a physician's assistant, wrote a note stating Valdez was "totally and permanently disabled for over one year." Valdez was to follow-up in one month or sooner if needed. He failed to show up for an appointment scheduled for April 23, 2001, but sought medical treatment for an injured right ankle in June 2001.

On January 27, 2002, Valdez completed "Claimant's Daily Activities Questionnaire," stating he had extremely limited daily activities, but could understand and remember what he watched and read "very well"; prepared three meals per day; drove; concentrated well until he experienced pain; followed instructions and directions well; and took only Tylenol for pain.

On April 12, 2002, Howard Shoemaker, M.D., examined Valdez for the DDS. Valdez had a valid Colorado drivers license and drove. He lived alone in his own house and took care of all household chores. Though his girlfriend helped with housecleaning and heavy duties, he was "completely independent."

Dr. Shoemaker noted Valdez was in no acute distress, walked with a normal gait, had normal coordination and station, and undressed without too much difficulty. Valdez has "slightly limited" lumbar motion. He had "no obvious spasm or deformity"; normal motor strength in all major muscle groups; normal sensation in the upper and

4

lower extremities; and intact reflexes.  Dr. Shoemaker opined Valdez should be able

to work an 8-hour day with alternating standing, sitting, and walking every 1 to 2 hours,

and lifting 50 pounds occasionally and 25 pounds frequently, but should avoid

repetitive bending and twisting at the waist.

On December 17, 2002, Valdez presented to Family Medicine Clinic, reporting

low back problems and pain, for which he took Tylenol.

<u>Administrative Proceedings</u>

On May 26, 1994, an ALJ found Valdez was disabled beginning in April 1992,

due to severe degenerative disc disease of the lumbar spine with a history of surgery

with fusion.  The ALJ found Valdez could not sit, stand, and walk for 4 to 6 hours per

day and that he could not perform the full range of sedentary work.

After a continuing disability review (CDR) in January 1998, the State agency

found Valdez's disability continued.  After a CDR in April 2002, the State agency found

Valdez no longer was disabled as of April 1, 2002.  Upon Valdez's request for

reconsideration and after a disability hearing, a disability hearing officer found on

August 8, 2002, that, as of April 1, 2002, Valdez had experienced medical

improvement that was related to his ability to work; he had the residual functional

capacity to perform a range of light work; and he could perform a significant number of

light jobs, including inspector, final inspector, and finishing inspector.

Valdez requested a hearing before an ALJ.  Following a hearing on February

20, 2004, the ALJ issued a decision on June 15, 2004, finding Valdez's disability

ceased on April 1, 2002 and that his eligibility for disability insurance benefits terminated in June 2002. The ALJ found that as of April 1, 2002, Valdez regained the residual functional capacity to perform sedentary work and Medical-Vocational Guideline 201.27 directed a conclusion that he was not disabled.

The Appeals Council determined that there was no reason to review the ALJ's final administrative decision. Thus, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 404.981. Valdez exhausted his administrative remedies and this case is ripe for my review under section 205(g) of the Act, 42 U.S.C. § 405(g).

## Standard of Review

I review the Commissioner's decision to determine whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied. *See Branum v. Barnhart,* 385 F.3d 1268, 1270 (10th Cir. 2004); *Howard v. Barnhart,* 379 F.3d 945, 947 (10th Cir. 2004). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (Citations omitted). I "may neither reweigh the evidence nor substitute [my] discretion for that of the [ALJ]." *Id.* (Citations omitted). Where evidence as a whole can support either the agency's decision or an award of benefits, I must affirm the agency's decision. *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).

Discussion

Valdez raises several points of error: (1) the ALJ erred at step two of the

sequential analysis[1] by failing to find that his impairments met the severity

requirements of an impairment set forth in the Listing of Impairments (Listings), 20

C.F.R. part 404, subpart P, appendix 1; (2) the ALJ erred by finding he experienced

medical improvement of his impairments, and (3) the ALJ erred by finding he had

medical improvement of his impairment which related to his ability to work.

For the first point, I note that Valdez did not set forth what Listing he claims he

met. Further, the evidence simply failed to reflect that Valdez met a Listing.

The Listings describe impairments of the major body systems, which are

considered so severe as to establish an individual's inability to perform any gainful

activity. *See* 20 C.F.R. § 404.1525(a). Each Listing is defined in terms of several

specific medical findings. *See id.* § 404.1525(c). "For a claimant to show that his

impairments match a Listing, they must meet *all* of the specified medical criteria. An

---

[1] "An eight-step sequential evaluation process is used in termination of benefit
reviews." *Hayden v. Barnhart*, 374 F.3d 986, 988 (10th Cir. 2004) (citing 20 C.F.R.
§ 404.1594(f)(1) through (8)). The ALJ must determine in sequence whether (1) the
claimant was working; (2) the claimant had an impairment that met or equaled the
requirements of a listed impairment; (3) the claimant had experienced medical
improvement in his condition; (4) whether the medical improvement was related to
his ability to work; (5) if there was no medical improvement or if there was medical
improvement but it was not related to his ability to work, whether an exception applied;
(6) whether he had a severe impairment; (7) whether he could perform work which he
had done in the past; or (8) whether there was other work he could perform. *See* 20
C.F.R. §§ 404.1594(f)(1) - (8); *see also* 42 U.S.C. § 423(f).

7

impairment that manifests only some of those criteria, no matter how severe, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

In this case, assuming Valdez is arguing that he met Listing 1.04, describing disorders of the spine, the evidence in April 2002 failed to show that Valdez had the requisite diagnoses or signs. Because Valdez failed to show he had all the criteria of Listing 1.04 or any other Listing, his back impairment did not qualify to meet a Listing.

For the second point, "[i]n connection with possible termination of benefits, medical improvement must be based on changes (improvement) in the symptoms, signs, and/or laboratory findings associated with [a claimant's] impairment(s) . . . .'" *Glenn v. Shalala*, 21 F.3d 983, 986 (10th Cir. 1994) (internal quotation marks and citations omitted); 20 C.F.R. §§ 404.1594(a)-(c).

The most recent favorable medical decision or the comparison point decision was the January 22, 1998 determination, made after a CDR, that found Valdez's disability was continuing. Just prior to this CDR, Dr. Sacha had found in December 1997, that Valdez had only 30 degrees of lumbar flexion, flattened lumbar lordosis, diffuse point tenderness over the lumbosacral region, positive straight-leg-raising, right calf atrophy, decreased sensation in the right L3 distribution, and absent left ankle reflexes.

By February 2001, Valdez had a normal gait, negative straight-leg-raising and good strength. Further, in contrast to Dr. Sacha's December 1997 findings, Dr. Shoemaker found in April 2002, that Valdez was in no acute distress, walked with

8

a normal gait, had normal coordination and station, dressed and undressed without too much difficulty, had only "slightly limited" lumbar motion, had "no obvious spasm or deformity," had normal motor strength in all major muscle groups tested, had normal sensation in the upper and lower extremities, and had intact reflexes. I find that Dr. Shoemaker's objective findings, based on his independent, clinical examination, provided support for the ALJ's determination that Valdez's back impairment had improved since January 1998.

In finding Valdez's back impairment had improved, the ALJ evaluated Valdez's subjective complaints and provided specific reasons, which are supported by the record, for disbelieving that his impairments continued to be disabling. These reasons included infrequent treatment for chronic back pain, despite seeking treatment for minor ailments; lack of need for pain medications or anything stronger than over-the-counter pain medications for chronic back pain; positive response of acute back pain to prescription medication; failure to attend a follow-up appointment for his acute back pain in April 2001; inconsistencies between his testimony and the medical evidence; and his daily activities. I decline Valdez's invitation to reweigh the evidence. *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (declining invitation to reweigh the evidence)*; White*, 287 F.3d at 909 (holding that the court may not reweigh the evidence and substitute its judgment for the ALJ's).

Of particular note, Valdez argues that the ALJ did not properly consider his February 2001 back re-injury. I do not agree. The ALJ considered the evidence

9

surrounding Valdez's February 2001 back re-injury in detail.  The ALJ noted fairly

benign objective findings on February 2, 2001; that prescription pain medication

helped significantly; that Valdez failed to attend a follow-up appointment in April 2001;

and that Valdez sought treatment for ailments other than his back in June 2001.  The

ALJ also noted Valdez's admission that the February 2001 re-injury was not a

significant problem.  *Cf. White*, 287 F.3d at 909-10.  The ALJ provided specific

reasons, which are supported by the record, for disbelieving Valdez's claim that he

continued to be disabled as of April 1, 2002, and I uphold his findings.  *See White*,

287 F.3d at 909 (holding that the court may not reweigh the evidence and substitute

its judgment for the ALJ's).

For the third point, "[a] medical improvement is only related to a claimant's

ability to work if there has been a decrease in the severity . . . of the impairment(s)

present at the time of the most recent favorable medical decision and an increase in

[his] functional capacity to do basic work activities . . . ."  *Glenn*, 21 F.3d at 986 (internal

quotations and citations omitted); 20 C.F.R. §§ 404.1594(a)-(c).

It is the Commissioner's responsibility to assess Valdez's residual functional

capacity.  *See Howard*, 379 F.3d at 949*; Rutledge v. Apfel*, 230 F.3d 1172, 1175 (10th

Cir. 2000); 20 C.F.R. § 404.1546.  The Commissioner, through the ALJ, determined in

May 1994, that Valdez did not have the residual functional capacity to perform the full

range of sedentary work because he could not sit, stand, or walk for 6 to 8 hours per

day and pain interfered with his ability to concentrate on work-related functions.  The

State agency did not make any findings changing Valdez's residual functional capacity in connection with the January 1998 CDR. In June 2004, the Commissioner, through the ALJ, determined that by April 2002 Valdez had gained the residual functional capacity to perform the full range of sedentary work.

The opinions of Drs. Shoemaker and Twombly that Valdez could perform a range of medium work provided support for the ALJ's determination that, giving Valdez the benefit of the doubt, he could perform sedentary work.

In making a determination at step 8 of the sequential evaluation that the medical improvement in Valdez's impairment was related to his ability to work, the ALJ relied on the Guidelines provided in 20 C.F.R. part 404, subpart P, app. 2. This was proper because, as the ALJ found, (1) Valdez had no significant nonexertional impairment, (2) he could do the full range of sedentary work on a daily basis, and (3) he could perform most of the jobs at the sedentary exertional level. *See Thompson*, 987 F.2d at 1488. The ALJ's reliance on the Guidelines fulfilled his burden of proving the existence of jobs in the national economy that Valdez could perform, given his age, education, prior work experience, and residual functional capacity. *See Heckler v. Campbell*, 461 U.S. 458 (1983). In this case, the Guidelines directed the conclusion that, based on Valdez's residual functional capacity for sedentary work, age at the time of the administrative decision (42), high school education, and previous light work experience, he was not disabled. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, Table No. 2, Rule 201.27.

Simply because Dr. Sacha opined in December 1997 that Valdez could perform medium work, and Dr. Shoemaker opined in April 2002 that Valdez could perform medium work, does not mean that Valdez did not have a medical improvement related to his ability to work. The January 1998 CDR stopped at the first part of the eight-step sequential analysis, when it was concluded that Valdez had not experienced improvement in the severity of his back impairment from the May 26, 1994 fully favorable decision. Dr. Sacha's December 1997 opinion that Valdez could perform medium work was not adopted in the January 1998 CDR. The State agency never progressed beyond step two of the eight-step sequential evaluation.

Finally, I do not agree with Valdez that the ALJ erred in not including additional limitations in his hypothetical question to the vocational expert, including a need to change positions every 1 to 2 hours, no repetitive bending or twisting, and only occasional stooping and crouching. A need to alternate sitting and standing every 1 to 2 hours would not erode the full range of sedentary work because such a need could be accommodated by scheduled breaks. *See* Social Security Ruling 96-9p. Additionally, restrictions to occasional stooping and crouching, both progressive forms of bending, would not erode the sedentary occupational base. *See* Social Security Rulings 83-14 and 96-9p. Finally, twisting is not a requirement of sedentary work. *See* 20 C.F.R. § 404.1567(a); Social Security Rulings 83-14 and 96-9p.

<u>Conclusion</u>

I conclude that the ALJ's decision that Valdez ceased to be disabled as of April

1, 2002, is supported by substantial evidence and not contrary to law.  Accordingly, it

is ordered that the decision of the Commissioner be affirmed.

DATED at Denver, Colorado, on August 22, 2005.

BY THE COURT:


/s/ Walker D. Miller
United States District Judge